IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                 Cr. No. 18-2639 KG

RAQUEL CORTEZ and
JOSEFINA REYES-MORENO,

    Defendants.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon Defendants' Joint Motion to Suppress Evidence and Statements (Motion to Suppress), filed September 27, 2018. (Doc. 66). The United States filed a response on October 18, 2018, and Defendants filed a reply on October 23, 2018. (Docs. 71 and 80). On October 25, 2018, the Court held an evidentiary hearing on the Motion to Suppress. At the hearing, Luis Martinez and Samuel Williams represented the United States, Bernadette Sedillo and Meghan McLoughlin represented Defendant Raquel Cortez, and Stephen Hosford represented Defendant Josefina Reyes-Moreno. Both Defendants were present. Having considered the Motion to Suppress, the accompanying briefs, the evidence admitted at the October 25, 2018, hearing, and the argument of counsel at the hearing, the Court denies the Motion to Suppress.

*I. Findings of Fact[1]*

On May 1, 2018, New Mexico State Police Officer Christopher Alvarez was working Operation Stonegarden overtime between 1:00 p.m. and 6:00 p.m. Under Operation Stonegarden, New Mexico State Police Officers notify Border Patrol of suspicious activities subject to the Border Patrol's jurisdiction.

On the afternoon of May 1, 2018, Officer Alvarez was parked next to New Mexico State Police Sergeant Gomez along the west side of State Road 80 near mile marker 26, facing south. State Road 80 is a two-lane highway running north-south. It is primarily used for smuggling contraband and undocumented aliens from Mexico because it does not have a permanent Border Patrol checkpoint. The speed limit between mile marker 25 and 30 on State Road 80 is 55 miles per hour.

At 4:07 p.m., Officer Alvarez was running a stationary speed radar. At that time, he observed a northbound pickup truck with an extended cab speeding at 66 miles an hour. Officer Alvarez proceeded to make a U-turn in his patrol unit to stop the truck for a traffic violation. In doing so, Officer Alvarez initiated the lights on his vehicle and his vehicle's dash cam. The truck stopped at mile marker 27. Officer Alvarez saw that the truck had an Alabama license plate.

After stopping behind the truck, Officer Alvarez entered the license plate in his Computer Aided Dispatch (CAD). Tr. at 18. He then approached the passenger's side door to speak with the driver, identified as Defendant Cortez. Officer Alvarez identified himself and told Cortez the

---

[1] In deciding a motion to suppress, the Court views the evidence in the light most favorable to the United States. *See, e.g., United States v. Turner*, 2013 WL 5727404, at *9 (D. Kan.) ("While the Court is cognizant that it must view the facts in the light most favorable to the Government, it may not draw inferences that are not supported by the record, nor accept facts that are contrary to the record."); *United States v. Ortega*, 2012 WL 12894242, at *4 (S.D. Fla.) ("viewing the facts adduced at the suppression hearing in the light most favorable to the government....").

2

reason for the stop. Officer Alvarez then asked Cortez for her license, insurance, and registration. Officer Alvarez noticed a female passenger, later identified as Defendant Reyes-Moreno, and a child both sitting in the front seat. Officer Alvarez did not notice anyone sitting in the rear seat.

Next, Officer Alvarez asked Cortez to exit the truck and stand near the right front area of his patrol unit. Officer Alvarez asked Cortez questions about her travel plans and who was traveling with her. Cortez responded that they were traveling from Douglas, Arizona, to Alabama, and that she was traveling with her sister and nephews. Officer Alvarez asked Cortez other questions about her niece and nephew, where she was staying, who she was staying with, and whether she was working. Officer Alvarez also asked Cortez who owns the truck. While speaking with Cortez, Officer Alvarez ran Cortez's Alabama driver's license on CAD to check for any warrants. Tr. at 18. Officer Alvarez testified that he engages drivers in conversation to assess officer safety.

Officer Alvarez then went back to the truck to check the VIN on the windshield to make sure it matched the registration. While he was at the truck, Officer Alvarez asked Reyes-Moreno questions about where she was coming from and how long she and Cortez had been in Douglas. At that time, he noticed two adult males seated in the rear seat of the truck with a child in between them. Consequently, Officer Alvarez asked Reyes-Moreno who was in the truck. She stated that her niece and nephew were in the truck and two men. Reyes-Moreno further stated that she did not know the men and that she and Cortez had picked them up at a gas station. Officer Alvarez then asked the men for identification, which they did not have. Officer Alvarez noted that they did not look directly at him.

Officer Alvarez then returned to his patrol unit to request a Border Patrol agent to check the legal status of the men. About seven minutes elapsed from the time the truck stopped until the time Officer Alvarez radioed for a Border Patrol agent.[2]

Officer Alvarez then questioned Cortez about whether she and Reyes-Moreno are biological sisters and if there are lakes in Alabama. Apparently, Cortez's driver's license or the registration had an address referring to a lake. Officer Alvarez testified that while he was conversing with Cortez he was in the process of writing the citation. Officer Alvarez apparently ran Reyes-Moreno's driver's license on CAD at that time. Tr. at 61.

About ten minutes into the stop, Officer Alvarez explained to Cortez the speeding citation and how to either plead guilty or not guilty to the citation. Cortez stated she wanted to pay the citation. Officer Alvarez noted that the fine would be in the 80s, suggesting that he had not yet completed the citation and so could not yet give an exact amount for the fine. He also explained to Cortez the different options for paying the fine. In fact, the traffic citation indicates that Officer Alvarez began filling out the citation at 4:18 p.m., 11 minutes after the stop began. Government Ex. 2. At about 12 minutes after the stop began, dispatch informed Officer Alvarez that a Border Patrol agent would arrive in 20 minutes.

Officer Alvarez continued typing up the citation. About 13 minutes into the stop, Sergeant Gomez arrived. After Sergeant Gomez arrived, Officer Alvarez asked Cortez more questions about Reyes-Moreno's stay in Douglas and about who was in the truck. Cortez responded that she picked up the men at a gas station and that they wanted a ride to New Mexico.

---

[2] The Court's references to time come from Government's Exhibit 1. Exhibit 1 is Officer Alvarez's dash cam video of the stop and encounter. The timeline on the video starts about one minute and 30 seconds prior to the truck's stop on the shoulder of the highway. The Court's time estimates begin when the truck stopped. Consequently, those time estimates rely on the video's timeline minus one minute and 30 seconds.

At this point, Cortez's and Reyes-Moreno's driver's licenses were placed on the dashboard of Office Alvarez's patrol unit.

About 16 minutes after the stop began, Officer Alvarez informed Cortez that the penalty assessment for the traffic citation is $87. This evidence shows that Officer Alvarez had completed enough of the traffic citation to know the exact penalty assessment. Officer Alvarez and Sergeant Gomez continued asking Cortez questions about the men and who was in the back seat.

Approximately a minute or so after informing Cortez of the penalty assessment and the additional questioning about the men, Officer Alvarez asked Cortez how much she weighed and then went to the truck to check the registration to confirm the year of the truck's manufacture. According to Officer Alvarez, Cortez's weight from her Alabama driver's license and the year of the truck did not populate the required citation fields as he was trying to complete the citation form on the computer. It took Officer Alvarez about a minute to check the registration to confirm the year of the truck's manufacture and to walk back to his patrol unit.

The Border Patrol agent arrived about 18 minutes after the stop began. Before the Border Patrol agent approached Officer Alvarez, Officer Alvarez stated to Cortez that he checked the year of the truck's manufacture and that he would explain the citation. Before Officer Alvarez could explain the citation to Cortez, the Border Patrol agent came up to Officer Alvarez and Officer Alvarez briefly told the Border Patrol agent that Cortez had picked up two men at a gas station to give them a ride. Officer Alvarez then gave the citation to Cortez, instructing her to pay the $87 fine in 30 days. About a minute later, Officer Alvarez retrieved the driver's licenses from patrol unit dashboard, thereby ending the portion of the encounter related to the traffic citation. At that time, about 20 minutes had elapsed since the stop began.

Officer Alvarez testified that it could take between 10 and 20 minutes to complete a traffic citation. Tr. at 31. One factor for taking longer to complete a traffic citation was the "new system." *Id.* With this new system, the computer could go down requiring the officer to "mess with it" in order to fix the problem. *Id.*

The Court notes that the dash cam video contains multiple beeps on the audio coming from the patrol unit, especially near the beginning of the stop. The Court finds that the evidence does not adequately explain the meaning of specific beeps. As such, the Court cannot attribute any significance to the beeps.

## II. Conclusions of Law

Defendants argue that Officer Alvarez violated their Fourth Amendment right to be free from unreasonable seizures as well as their Fifth Amendment right to have their *Miranda* rights read to them prior to a custodial interrogation. Defendants, therefore, move to suppress the identity of the two male passengers and the statements by Defendants and those males. The United States opposes the Motion to Suppress in its entirety.

### A. *Whether Officer Alvarez Violated the Fourth Amendment*

Defendants claim that Officer Alvarez unlawfully seized them by unreasonably prolonging the traffic stop in order for the Border Patrol agent to arrive. The United States argues that Officer Alvarez did not unreasonably prolong the stop. Alternatively, Defendants claim that Officer Alvarez did not have a basis for extending the traffic stop. In response to this claim, the United States argues that Officer Alvarez could extend the traffic stop because he had reasonable suspicion to believe Defendants were transporting illegal aliens.

The Court recognizes that Defendants have the burden of proving whether the Fourth Amendment is implicated. *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017).

6

The United States, on the other hand, bears the burden of proof by the preponderance of the evidence to show that the challenged action did not violate Defendants' Fourth Amendment rights. *United States v. Matlock*, 415 U.S. 164, 177 (1974).

*1. Whether Officer Alvarez Unreasonably Prolonged the Traffic Stop*

For an investigative detention, or *Terry* stop seizure, to be reasonable under the Fourth Amendment, an officer's actions must be "reasonably related in scope to the circumstances which justified the [stop] in the first place." *United States v. Morgan*, 855 F.3d 1122, 1125 (10th Cir. 2017) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, … and attend to related safety concerns…." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). "Because addressing the [traffic] infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'" *Id.* (citation omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* It is the "State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

"Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop" such as inquiries involving "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 135 S. Ct. at 1615 (citations omitted). In addition, "questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop." *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001).

Also, "[a]n officer … may conduct certain unrelated checks during an otherwise lawful traffic stop," but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 135 S. Ct. at 1615. However, "[o]n-scene investigation into other crimes … detours from" the mission of a traffic stop. *Id.* at 1616. Furthermore, conducting "additional redundant checks in order to prolong the stop … all without additional reasonable suspicion" makes "the prolongation unreasonable." *United States v. $167,070.00 in U.S. Currency*, 112 F. Supp. 3d 1108, 1121 (D. Nev. 2015), *aff'd sub nom. United States v. Gorman*, 859 F.3d 706 (9th Cir. 2017), *order corrected,* 870 F.3d 963 (9th Cir. 2017).

In this case, once Officer Alvarez stopped the truck, Officer Alvarez engaged in inquiries incident to a traffic stop such as checking drivers' licenses, the license plate, the registration, insurance, and the VIN. Officer Alvarez also asked Cortez and Reyes-Moreno about their travel plans, an inquiry within the scope of a traffic stop. Admittedly, Officer Alvarez conducted checks unrelated to the traffic stop, but he did so while completing the citation. Consequently, he did not prolong the stop by conducting those checks. Moreover, Officer Alvarez did not take additional time to investigate whether the adult male passengers, in fact, were illegal aliens. Officer Alvarez merely asked the men for their identification and when they stated they did not have identification, he properly requested a Border Patrol agent to come and investigate the matter. Also, considering that Cortez's Alabama driver's license did not populate the part of the citation requiring her weight and the year of the truck was missing on the citation, it was reasonable, and not redundant, for Officer Alvarez to ask Cortez for her weight and to make sure he had the correct year of the truck's manufacture. Viewing the totality of the evidence in the light most favorable to the United States and considering that there is no bright line rule for

determining the reasonableness of the scope and length of a traffic stop, the Court concludes that, in this case, the scope and length of the stop for the traffic infraction was reasonable and did not violate the Fourth Amendment.

Because the scope and length of the traffic stop was reasonable and not a violation of the Fourth Amendment, the Court need not analyze whether the scope and length of the traffic stop was reasonably extended on the basis of reasonable suspicion of alien smuggling. Consequently, the Court will address next the Fifth Amendment claim.

*2. Whether Officer Alvarez Violated the Fifth Amendment*

Defendants also argue that Officer Alvarez violated the Fifth Amendment by interrogating them without giving a *Miranda* warning first. The United States argues that the Fifth Amendment was not implicated because Defendants were not in custody during the traffic stop.

Under *Miranda*, the government is barred from using at trial statements obtained during a custodial interrogation before the defendant is given the *Miranda* warning, unless the defendant waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "*Miranda* thus established a two-part analysis for determining when the prescribed procedural safeguards must be provided: (1) the individual must be in custody, and (2) the individual must be subjected to questioning that meets the legal definition of interrogation." *United States v. Revels*, 510 F.3d 1269, 1273 (10th Cir. 2007).

A person is "in custody" when under the totality of the circumstances "a reasonable [person] in the suspect's position would have understood his situation … as the functional equivalent of formal arrest." *Id.* In a routine traffic stop situation, the stop "is characterized as an investigative detention rather than a custodial arrest." *United States v. Wood*, 106 F.3d 942,

9

945 (10th Cir. 1997). Consequently, "*Miranda* warnings are simply not implicated in the context of a valid *Terry* stop." *United States v. Perdue*, 8 F.3d 1455, 1464 (10th Cir. 1993).

> This view has prevailed because the typical police-citizen encounter envisioned by the Court in *Terry* usually involves no more than a very brief detention without the aid of weapons or handcuffs, a few questions relating to identity and the suspicious circumstances, and an atmosphere that is "substantially less police dominated than that surrounding the kinds of interrogation at issue in *Miranda*."

*Id.* (citation and quotation marks omitted). *See also United States v. Benard*, 680 F.3d 1206, 1211–12 (10th Cir. 2012) ("Traffic stops do not usually implicate *Miranda* concerns, since a traffic stop is typically noncoercive and nonthreatening.").

In this case, Officer Alvarez detained Defendants in the context of a valid *Terry* traffic stop. The totality of the circumstances of the detention do not suggest that Officer Alvarez used his weapon or handcuffs to hold Defendants, or that he in some way acted in a coercive or threatening manner which a reasonable person would perceive to be the "functional equivalent of a formal arrest." Defendants, therefore, have failed to demonstrate that they were in "custody" during the traffic stop. Thus, Defendants' Fifth Amendment rights were not implicated when Officer Alvarez questioned them during the traffic stop.

IT IS ORDERED that Defendants' Joint Motion to Suppress Evidence and Statements (Doc. 66) is denied.

_____
UNITED STATES DISTRICT JUDGE